# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00307-CV

### A. A., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 315,843-B, THE HONORABLE ALAN MAYFIELD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A.A. (Mother) appeals the trial court's decree, which was entered after a bench trial and which terminated her parental rights to her child, Z.A. (Child).[1]  The trial court found by clear and convincing evidence that five of the statutory predicate grounds for termination were present, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (M), (N), (O), and that termination was in Child's best interest, *see id.* § 161.001(b)(2).  In two appellate issues (the second with several subparts), Mother contends that the statutory predicate grounds of subsections (D), (E), (N), and (O) were not sufficiently proven and that neither was the best-interest requirement.  We affirm.

---

[1]  We refer to A.A. and Z.A. by their initials or as Mother and Child.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).  The parental rights of Child's father also were terminated in the trial court's decree, but he is not a party to this appeal.

## BACKGROUND

In June 2018, Mother's parental rights to another child were terminated based in part on her having either knowingly placed or allowed the child to remain in conditions or surroundings which endangered the child's physical or emotional well-being or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being. Then again in September 2019, her parental rights to another child were terminated based in part on a similar endangerment finding. Over the course of those suits, according to the guardian *ad litem*, a therapist concluded that Mother "is not capable of caring for any child."

In February 2020, Child was born to Mother, and six days later the Department received a report alleging neglectful supervision. The report alleged that Mother had tested positive for methamphetamine during the pregnancy and delivered Child in a different county "due to concerns CPS would be called upon delivery to remove the child and she was hiding from the Department." The guardian *ad litem* from the prior case learned that Mother had delivered another newborn, so she reported her concerns to the Department. An adoption worker also spoke with the Department to communicate concerns about Mother's parenting another child. The adoption worker explained that Mother "is diagnosed with . . . [i]ntellectual and developmental disability," "has cerebral palsy," and "is unable to mentally and physically care for a child."

The Department filed this suit to terminate Mother's parental rights to Child ten days after he was born and sought temporary managing conservatorship of Child during the pendency of the suit because Mother has a history of "inability to care for a child due to her mental and physical disabilities"; "is unable to keep the child safe from dangers" because she has in the past gotten "involved in domestic violence relationships," including as "the perpetrator"; and

2

"engages in substance abuse." Just under a month later,[2] the trial court placed Child in the "substitute care" of the Department and gave it temporary managing conservatorship of Child because of "a danger to the physical health or safety of the child caused by [Mother's] acts or failure to act."

The Department prepared a Family Service Plan, imposing services on Mother to complete before the Department would consider returning Child to her permanently, considering her intellectual disabilities and medical conditions. Those disabilities or conditions were later summarized as including diagnoses of post-traumatic stress disorder; amphetamine-type substance use disorder (moderate to severe); borderline intellectual functioning; having suffered physical abuse, sexual abuse, and neglect, all as a child victim; and related psychosocial stressors. Among the Plan's requirements was for Mother to participate in protective-parenting classes and in therapy. She was referred to several therapists, but she "stopped attending for all of them," so the therapists discharged her "unsuccessfully." One therapist expressed "concerns about [Mother's] intellectual functioning and being able to care for a child," and no therapist recommended that Mother be able to visit Child while unsupervised.

Department caseworkers, including Jocelyn Holdburg, communicated with Mother so she could understand what the Plan required of her. Holdburg, once assigned to Mother's case in February 2021, had regular telephone or text-message conversations with Mother. Holdburg did so in part "to make sure that [Mother] had a clear understanding of what her services are" and on at least one occasion told Mother "that she needed to reach out to Mr. Sweeney to restart individual counseling to address" her disability and intellectual functioning. Mother never did so.

---

[2] The court had reset an earlier temporary-orders hearing to this next month so that an attorney could be appointed to assist Mother.

Holdburg also told Mother "about what the consequences of termination of her parental rights are," including "that if she continues to not participate in her family plans of service that she would lose rights to [Child] just the same way as she did with her two previous children." In Holdburg's view, Mother could have "achieve[d] parenting skills" from the protective-parenting classes despite her intellectual disabilities. Holdburg was trained to work with parents like Mother because Holdburg had earned a master's degree in social work and had taken part in coursework and Department trainings about the effects of disabilities like those that Mother suffers from.

Holdburg observed what she thought of as "confusion and irrational thought" by Mother. Holdburg explained that Mother's irrational thoughts could have been a result of either Mother's drug use or mental-health problems. Mother also has epileptic-seizure disorder.

While this suit was pending, Mother used methamphetamine at least twice. First, in December 2020, she voluntarily checked into Canyon Creek Behavioral Hospital for "rehab" and at admission tested positive for methamphetamine. She was 15-weeks pregnant at the time. Then about a month before her appearance at the final hearing in this suit, she used methamphetamine again.

All the while, Child lived with a foster parent, who had adopted two older half-siblings, to whom Mother's rights had been terminated. The foster parent wanted to adopt Child as well. Holdburg found Child to be bonded with the foster parent and with his half-siblings and that his emotional and physical needs were being met in the foster home. She thought it "a safe, suitable home" for him. By contrast, Holdburg believed that Mother's history of drug use indicated that she could be a danger to Child. The drug use plus her past parental-rights terminations suggested to Holdburg that it is not in Child's best interest to have a relationship with Mother. Further, Mother's "mental health and medical diagnoses" meant to Holdburg that caring

4

for Child "would be a real struggle for" Mother. Holdburg also felt that Mother lacks the "strong support system" necessary to make raising a child under these circumstances possible. Mother had not demonstrated to Holdburg any acquisition of parenting skills during this suit.

Holdburg testified at the final hearing of this suit, and the Department also offered exhibits, which were admitted into evidence. Among the exhibits was the report of the psychological evaluation that Mother had undergone as required by her Plan. The report included discussion of Mother's personal difficulties, including her drug use. It said that her "[i]ntellectual functioning was currently estimated to be within the well below average (borderline) range." It noted that she "does have the intellectual capacity and cognitive ability to comprehend the information communicated in the classes provided by CPS with assistance" and that "[i]n a therapeutic relationship, she should be able to intellectually work through the problems of her past abuse . . . with assistance." Mother admitted to the evaluators "that drug use may be the source of some problems in her life." But she also showed them that she "sees little need for changes in her behavior." The evaluators saw in Mother "[c]urrent difficulties in her social support system" and recommended "individual counseling until discharged by her therapist" in part because of the diagnoses listed above, which indicated an "[o]verall level of disability" of "[s]evere." They concluded that she should "be monitored closely if her children are returned to her care."

Mother testified that she thought it in Child's best interest to stay with her because he "made a lot of progress" with her and she has "become a better person" and begun "view[ing] things in a whole different manner." She explained her methamphetamine use: although she knew that the court had ordered her not to use illegal drugs, she took it to cope because she felt like a failure after the earlier termination, "wanted to die," and felt like the Department would regularly "find excuses to take [Child] away" from her. She also ceased therapy appointments with

5

Sweeney, she said, "[b]ecause I did everything that he asked me to do and he still tried to take my rights." She admitted that the foster parent "takes good care of" Child but planned on Child's being returned to her. Her plans for his return were that she would go back to rehab and that she was "currently working on" finding a "support system," including with the family of the father of the child whom she was then expecting.

After the hearing, the trial court ruled that the Department had proven by clear and convincing evidence (i) the circumstances named in subsections (D), (E), (M), (N), and (O) of Family Code section 161.001(b)(1) and (ii) that terminating Mother's parental rights to Child was in Child's best interest. The court entered a conforming final decree, which Mother now appeals.

## STANDARD OF REVIEW AND APPLICABLE LAW

In suits such as these, two findings must be made before parental rights may be terminated. First, one of the statutory predicate grounds from Family Code section 161.001(b)(1) must be proven. Second, it must be proven "that termination is in the best interest of the child." Tex. Fam. Code § 161.001(b)(2). Both findings must be proven by clear and convincing evidence, *id.* §§ 161.001(b), 161.206(a), which means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established," *id.* § 101.007.

On appeal, the parent may challenge the legal or factual sufficiency of the evidence supporting either of the findings. When evaluating the legal sufficiency of the evidence, we cannot "ignore undisputed evidence contrary to the finding" but must otherwise view the evidence in the light most favorable to the judgment, which means we must "assume the factfinder resolved disputed facts in favor of the finding," *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018), and

6

"disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible," *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631; *J.F.C.*, 96 S.W.3d at 266.

A factual-sufficiency review, by contrast, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *A.C.*, 560 S.W.3d at 631. The reviewing court must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

Proof of just one of the statutory predicate grounds suffices to make the first required showing. *See In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). One of those statutory predicate grounds—subsection (M)—is proven when it is proven that the parent "had his or her parent–child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." Tex. Fam. Code § 161.001(b)(1)(M). A past subsection (D) or (E) finding thus can support termination under subsection (M) in a later suit. *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). Because of this, "[w]hen a parent has presented the issue on appeal, . . . den[ying] review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.* at 235. We thus must review properly raised

7

challenges to findings under subsections (D) or (E) even when proof of another statutory predicate ground supports the first required showing.

The trial court is the factfinder in a bench trial and, as such, is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011). In an appeal after a bench trial, we assume that the trial court resolved disputed facts in favor of its decision if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266; *J.B. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-11-00196-CV, 03-11-00303-CV, 2012 WL 593484, at *4 (Tex. App.—Austin Feb. 24, 2012, no pet.) (mem. op.). We may not substitute our judgment for the trial court's and must defer to the trial court's findings, its determinations of witness credibility, and its resolution of evidentiary conflicts. *See A.J.R. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-19-00661-CV, 03-19-00662-CV, 2020 WL 1174189, at *7 (Tex. App.—Austin Mar. 12, 2020, no pet.) (mem. op.); *Mason v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00205-CV, 2012 WL 1810620, at *6 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.).

## DISCUSSION

Mother's appellate issues challenge the predicate findings made against her under subsections (D), (E), (N), and (O) of Family Code section 161.001(b)(1). But nowhere does her brief challenge the finding made against her under subsection (M). Because the decree here reflects a finding made against her under that subsection, we must conclude that the decree cannot be reversed for lack of the first required finding, under the statutory predicate grounds. We therefore overrule the relevant portions of Mother's first and second issues. We must review a properly challenged subsection (D) or (E) finding, however. *See N.G.*, 577 S.W.3d at 234–35.

8

**I. The evidence was sufficient to show that Mother had engaged in conduct that endangered Child's physical or emotional well-being.**

In a portion of her second issue, Mother contends that the evidence was legally and factually insufficient to support a finding against her under subsection (E). That statutory predicate allows for termination of parental rights when the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "Endanger" here means "to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (internal quotation omitted). "Endangering conduct under subsection (E) need not 'be directed at the child.' Nor must the child 'actually suffer[] injury.'" *Id.* "Conduct" involves both acts and omissions. *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 WL 5225432, at *5 (Tex. App.—Austin Nov. 10, 2021, no pet. h.) (mem. op.).

Endangering conduct often results from the parent's illegal-drug use: "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as" endangering conduct. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). This includes when the drug use "exposes the child to the possibility that the parent may be impaired or imprisoned." *J.M.*, 2021 WL 5225432, at *5 (quoting *M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *8 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.)).

The record here includes evidence of Mother's use of methamphetamine, including while she was pregnant, which itself was endangering conduct, and testimony that her using that drug would mean that she could endanger Child. Holdburg testified that Mother's drug use indicated that she "was a danger to her child or could be a danger to her child," especially because of the positive methamphetamine result while Mother was pregnant with her next child. Then

during her testimony, Mother added that she used methamphetamine in 2021. Although she was equivocal about when it happened, perhaps suggesting that she was referring to the same December 2020 positive test when checking into Canyon Creek, the trial court reasonably could have resolved this evidentiary discrepancy against her and in support of the endangerment finding. *See J.F.C.*, 96 S.W.3d at 266; *J.B.*, 2012 WL 593484, at \*4. There were thus two instances of methamphetamine use while this termination suit was pending. *See D.H. v. Texas Dep't of Fam. & Protective Servs.*, __ S.W.3d __, No. 03-21-00255-CV, 2021 WL 5098308, at \*5 (Tex. App.—Austin Nov. 3, 2021, no pet. h.) ("[A] parent's decision to use illegal drugs while the termination suit is pending, and the parent is at risk of losing her child, may support a finding of endangering conduct under subsection (E)."). Further, during the psychological evaluation, Mother admitted "that drug use may be the source of some problems in her life" but that she overall "s[aw] little need for changes in her behavior." In all, Mother had used methamphetamine at least twice since Child was born; she missed about three dozen required drug tests, *see id.* at \*6–7 (concluding that evidence was sufficient to support endangerment finding in part because when viewing evidence of missed drug tests in light most favorable to trial court's decision, court could conclude that Mother "failed to show for drug tests because those results would have been positive"); and Holdburg testified, and the psychological evaluation implied, that the drug use would harm Mother's ability to parent Child safely.

We also consider significant Mother's refusal to continue therapy sessions with Sweeney and others, though those had been recommended for her. A past therapist had concluded that Mother was incapable of caring for any child. She was diagnosed with intellectual and developmental disability. And she had used methamphetamine over a period of time. So the Family Service Plan's requirement in this case that Mother attend therapy appointments through

10

to completion was essential. Yet she ceased attending those appointments, so several therapists discharged her unsuccessfully. *See In re K.W.*, No. 02-08-00162-CV, 2009 WL 417913, at \*6 (Tex. App.—Fort Worth Feb. 19, 2009, no pet.) (mem. op.) ("Despite Appellant's bipolar diagnosis, she did not take medication and had not sought treatment from a mental health expert. This evidence also tended to show a potential emotional and physical danger to the children.").

There was thus sufficient evidence for the trial court to form the firm belief or conviction that Mother engaged in conduct that jeopardized Child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E); *J.F.-G.*, 627 S.W.3d at 312; A.C., 560 S.W.3d at 631; J.F.C., 96 S.W.3d at 266.

As for factual sufficiency, we see no evidence in the record contradicting the subsection (E) finding. *See A.C.*, 560 S.W.3d at 631. At most, Mother testified that Child should be returned to her because she would agree to go back to rehab. From this, the trial court could have inferred that Mother's methamphetamine problem still had not been adequately addressed. We thus conclude that the disputed contrary evidence was not so significant that the court could not have formed a firm belief or conviction that a showing under subsection (E) had been made. *See id.* We therefore overrule the relevant portion of Mother's second issue and need not reach the other portions of that issue that concern statutory predicate grounds. *See* Tex. R. App. P. 47.1.

## II. The evidence was sufficient to show that terminating Mother's parental rights to Child was in Child's best interest.

Mother's remaining ground for reversal is that the best-interest finding was not supported by legally and factually sufficient evidence. *See* Tex. Fam. Code § 161.001(b)(2). Deciding "best interest" is "child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. A strong presumption exists that a child's best interests

11

are served by maintaining the parent–child relationship. *D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00323-CV, 2020 WL 7395924, at \*5 (Tex. App.—Austin Dec. 17, 2020, pet. denied) (mem. op.); *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). To determine whether termination is in a child's best interest, we consider the non-exhaustive factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976): (1) the child's wishes; (2) the child's present and future emotional and physical needs; (3) any emotional and physical danger to the child, now and in the future; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist these individuals in promoting the best interest of the child; (6) the plans for the child by the individual or agency seeking custody; (7) the stability of the proposed home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent–child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. The Department need not prove all these factors, and the lack of evidence under some factors does not preclude a finding that termination is in the child's best interest, "particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at \*3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.).

There was no evidence under the first factor as Child was too young to express any wishes. Nor was there any evidence presented under the second or fifth factors.

Under the third, eighth, and ninth factors, the trial court reasonably could have given significant weight to the evidence of Mother's methamphetamine use on more than one occasion while this suit was pending, including while pregnant with another child,

and of her ceasing therapy appointments despite demonstration that she needed the help to improve her parenting ability. As explained above, the testimony and exhibits discussing her methamphetamine use indicated that it would affect her ability to parent Child safely and that she did not see the need overall to make many changes to herself. Mother's explanation for her methamphetamine use was that she felt like a failure after an earlier termination case, "wanted to die," and felt like the Department would regularly "find excuses to take [Child] away" from her. She admitted, however, that she knew that the court had ordered her not to use any illegal drugs. She also testified that she was still working on developing a support system to help her take care of Child. Her disabilities presented obstacles to safe parenting that further work in therapy—required by her Family Service Plan—could address, but she ceased attending those appointments. Also, Mother had missed over two dozen scheduled visits with Child and about three dozen Plan-required drug tests. These three factors thus point in favor of termination.

Under the fourth, sixth, and seventh factors, Holdburg testified that Child's current situation living with the foster parent was "safe" and "suitable" and saw his emotional and physical needs met. Child lived in the foster home with his two half-siblings, both of whom had been adopted by the foster parent. The foster parent wanted to adopt Child as well, and Child was bonded with everyone in that home. Contrast what this evidence suggests about the foster parent's parenting skills with the evidence of Mother's. The combination of the methamphetamine use, her ceasing therapy appointments, and the many missed visits suggests that maintaining her parental rights to Child is not in Child's best interest. *See In re X.R.L.*, 461 S.W.3d 633, 640–41 (Tex. App.—Texarkana 2015, no pet.) ("[Parent]'s history of drug use, her failure to remain drug free, her inability or unwillingness to complete counseling, as well as her seeming disinterest in visiting her children speak volumes about her parenting skills. All of these factors suggest a

13

substantial likelihood that [parent] would be a danger to the children in the future or put them in a possibly harmful situation."). These remaining factors point in favor of termination.

The only evidence contradicting the best-interest finding concerned Mother's progress during the suit and her home. She testified that Child "made a lot of progress" with her and that she has since "become a better person" and begun "view[ing] things in a whole different manner." She also explained that her rehab stint at Canyon Creek was voluntary, and the record showed that she had completed some—but not all—of the tasks set for her by the Family Service Plan, including completing the psychological evaluation, protective-parenting classes, and OSAR. Mother described her home—a two-bedroom unit in a housing complex—as furnished and suitable for Child, with a bassinet but needing a larger crib because Child had grown. Even so, we conclude that the evidence, when viewed through the prism of the *Holley* factors, was sufficient to let the trial court form a firm belief or conviction that termination was in Child's best interest and that the contrary evidence was not so significant that the trial court could not have formed that firm belief or conviction. *See* Tex. Fam. Code § 161.001(b)(2); *A.C.*, 560 S.W.3d at 631; *J.F.C.*, 96 S.W.3d at 266. We thus overrule the remaining portion of Mother's second issue.

## CONCLUSION

We affirm the trial court's termination decree.

_____
Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   December 14, 2021